Lee MORGAN, Petitioner,

v.

**SECRETARY OF HOUSING AND URBAN DEVELOPMENT,**
Respondent.

**Frank Riciotti, III, Real Party in Interest.**

No. 91–9554.

United States Court of Appeals, Tenth Circuit.

Feb. 18, 1993.

Edward Mulhall, Jr., Delaney & Balcomb, P.C., Glenwood Springs, CO, for petitioner.

Thomas E. Chandler, Attorney, (John R. Dunne, Asst. Atty. Gen., David O. Simon, Acting Deputy Asst. Atty. Gen., Jessica Dunsay Silver, Attorney, and Linda F. Thome, Attorney on the brief), Dept. of Justice, Washington, DC, for respondent.

Before KELLY and McWILLIAMS, Circuit Judges, and BROWN, District Judge.[†]

PAUL KELLY, Jr., Circuit Judge.

Petitioner Lee Morgan appeals from a decision of an administrative law judge (ALJ) finding that he engaged in a discriminatory housing practice based on familial status against complainant Frank Riciotti, III, contrary to 42 U.S.C. § 3604(a)–(d).[1] The ALJ awarded Riciotti $14,297.99 in damages, imposed the maximum civil penalty of $10,000 and enjoined Morgan from discriminating against any persons with respect to housing because of familial status. *See* 42 U.S.C. § 3612(g)(3). The decision of the ALJ became final upon the expiration of thirty days without review by the Secretary. *See* 42 U.S.C. § 3612(h)(1). On appeal, Morgan challenges HUD's jurisdiction, the conciliation process, sufficiency of the evidence, and the award. Our jurisdiction arises under 28 U.S.C. § 2344 and 42 U.S.C. § 3612(i), and we affirm in part and reverse in part.

## Background

Morgan owned a mobile home park and leased spaces to mobile home owners for $175 per month. The park rules, which were drafted by a tenants' committee be-

[†] The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

1. 42 U.S.C. § 3604 provides in pertinent part:
   **Discrimination in the sale or rental of housing and other prohibited practices**
   As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—
   (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of ... familial status....
   (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of ... familial status....
   (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on ... familial status ... or an intention to make any such preference, limitation, or discrimination.
   (d) To represent to any person because of ... familial status ... that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.
   42 U.S.C. § 3602 provides in pertinent part:
   Definitions
   (k) "Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with—
       (1) a parent....

fore discrimination based on familial status was prohibited, barred new tenants with children from living in the park and required park management to approve new tenants.[2] The Secretary alleged two separate incidents concerning the rental of lots and the sale of mobile homes in which Morgan withheld approving prospective tenants, relying on existing park rules.[3]

## A. Sarno Home

In June 1989, tenants Michael and Rauna Sarno attempted to sell their home, priced at $29,500, to Debra and Frank Riciotti, III, who had a three-year old son. On June 2, the Riciottis offered the Sarnos $28,500. The Sarnos and the Riciottis attempted to persuade Morgan to waive the restriction on children. He refused. The Sarnos then received another offer from a couple with no children under eighteen. The offer was more than $28,500, but less than the $29,500 asking price. The Riciottis then made a second offer of $29,500, but on June 5, the Riciottis learned that the home was sold to the other couple for $29,500. The ALJ found that the unlawful "adults only" policy resulted in the sale of the Sarno home to the other couple rather than the Riciottis.

The next day, the Riciottis' attorney (Mrs. Riciotti's father) wrote Morgan a demand letter informing him that his refusal to consider the Riciottis' application for tenancy in the mobile home park violated the Fair Housing Act. Pet.Br.Add., doc. 5. The letter also indicated that unless Morgan reconsidered his decision, he would be sued. Upon receiving the letter, Morgan immediately contacted the Riciottis and ad-

vised them that he was retracting the policy. Morgan requested Riciotti withdraw his HUD complaint alleging discrimination based on familial status, and Riciotti agreed with the understanding that he would look for another home in the park. The Riciottis continued to look in the park during June, finding one home for sale that they did not like.

## B. Krigbaum Home

A day or two after the July 4 holiday, the Riciottis made a $35,500 offer to purchase a larger home in the park owned by Marilyn Krigbaum, and the offer was accepted. *Id.* at 43. However, on July 10, when the Riciottis met with Morgan to go over the park rules and obtain approval, they noticed, but were not concerned, that the rules still contained the "adults only" policy. They also noticed that the amount of the rent was $225, not $175 as before. The Riciottis declined to purchase the home. A month later, the Krigbaum home was sold to another couple without children under eighteen. The new owners received a copy of the park rules with the "adults only" policy excised and paid the increased $225 rent required of all new tenants. The Riciottis purchased a townhome and reinstated their complaint with HUD.

The ALJ determined that Morgan had not denied the Riciottis the opportunity to purchase the Krigbaum home because the "adults only" rule was not applied to them. Recognizing the possible inferences from Morgan's failure to excise the offending rule and the subsequent rent increase, the ALJ declined to find that such acts were

---

**2.** The relevant rules provided:
  3. It is management's intention to make the mobile home park entirely an adult park. That is, no children will be allowed in the park. Excepted from this rule are those tenants who own mobile homes in the park as of the date hereof. These individual[s] shall be allowed to have children. Any new tenants as of this date shall be subject to this rule and in the event that said tenants shall have a child born to them, they shall be required to remove or sell their mobile home within a reasonable time, not to exceed six months, after the birth of said child. All visiting children must stay in tenant's yard.

  19. In the event a tenant wishes to sell his mobile home, the prospect tenants must meet all requirements of the rules and regulation[s] of the park and have management[']s approval. The approval by management shall not be unreasonably withheld.
  I R. doc. C, answer ex. 1.

**3.** Mobile home lots for rent are considered dwellings under and within the scope of the Fair Housing Act. *See* 42 U.S.C. § 3602(b); *Stewart v. Furton,* 774 F.2d 706 (6th Cir.1985); *United States v. Warwick Mobile Home Estates, Inc.,* 537 F.2d 1148 (4th Cir.1976).

calculated to "otherwise make unavailable or deny" the Riciottis the Krigbaum home. *See* 42 U.S.C. § 3604(a). Rather, the ALJ determined that failure to excise the offending rule was inadvertent and the rent increase for new tenants was consistent with the rents charged by other parks, adopted prior to the Riciotti's second attempt to purchase a home in the park, and applied evenly to all new tenants. The Secretary has not appealed the ALJ's determination as to the Krigbaum home.

*Discussion*

I. *Jurisdictional Defense— Tenth Amendment and Commerce Clause*

■ Morgan first contends that HUD lacked subject matter jurisdiction over this case because of the absence of federal financing. All mobile homes were owned by the tenants and no evidence indicated that the Sarno or Krigbaum homes were financed with federal loans. Application of the Fair Housing Act after December 31, 1968, however, does not turn on the presence or absence of federal financing. *See* 42 U.S.C. § 3603(a).

Relying on the Tenth Amendment, Morgan next contends that the Secretary is exercising a power reserved to the States when he attempts to regulate mobile home space rentals. Recognizing that the Commerce Clause, U.S. Const. art. I, § 8, provided the federal jurisdictional base for the original Fair Housing Act, Morgan suggests that the amendments to the Act did not invoke the Commerce Clause and the Commerce Clause has never been exercised to prohibit discrimination based on familial status.

■ We reject this constitutional challenge to the Fair Housing Act amendments which pertain to familial status. The Eleventh Circuit has rejected virtually identical arguments. *See Seniors Civil Liberties Assn. v. Kemp*, 965 F.2d 1030, 1033–35 (11th Cir.1992) (per curiam). Morgan's challenge fails for several reasons. First, the familial status provisions regulate private citizens, rather than regulating the states as states; consequently, the Tenth

Amendment does not apply. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 537, 105 S.Ct. 1005, 1010, 83 L.Ed.2d 1016 (1985); *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 286, 101 S.Ct. 2352, 2365, 69 L.Ed.2d 1 (1981). Second, the absence of formal findings concerning the effect on interstate commerce of discrimination based on familial status does not prevent Congress from regulating under the Commerce Clause. *See Katzenbach v. McClung*, 379 U.S. 294, 299, 85 S.Ct. 377, 381, 13 L.Ed.2d 290 (1964). Only a rational basis need support a finding that a regulated activity affects interstate commerce and the means selected by Congress need only be reasonably adapted toward the permissible end. *Preseault v. ICC*, 494 U.S. 1, 16–18, 110 S.Ct. 914, 924–25, 108 L.Ed.2d 1 (1990); *McClung*, 379 U.S. at 303–04, 85 S.Ct. at 383–84.

■ The legislative record, when viewed against a backdrop of the legislative history of the 1968 Fair Housing Act, provides a rational basis for finding that the sale and rental of residential housing, including mobile home lots, concerns more than one state and "has a real and substantial relation to the national interest." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 255, 85 S.Ct. 348, 356, 13 L.Ed.2d 258 (1964). *See Senior Civil Liberties Ass'n*, 965 F.2d at 1034; *Fair Housing Act of 1967: Hearings on S. 1358, S. 2114, and S. 2280 Before Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking and Currency*, 90th Cong., 1st Sess. 6–14, 23–24 (1967). Housing discrimination based on familial status surely interferes with the efficient allocation of housing resources and could hinder interstate relocation. Congress could reasonably seek to remove such impediments by relying upon its commerce power to bar discrimination. *See* H.R.Rep. No. 711, 100th Cong., 2d Sess. 19, *reprinted in* 1988 U.S.C.C.A.N. 2173, 2180. *See also Seniors Civil Liberties Assn v. Kemp*, 761 F.Supp. 1528, 1545–46 (M.D.Fla.1991), *aff'd*, 965 F.2d 1030 (11th Cir.1992). Neither Congress nor the Secretary was required to

show "that these mobile home space rentals in any way affect interstate commerce," *see* Pet.Br. at 8, because Congress may regulate an entire class of activities which affect interstate commerce, a case-by-case analysis is not required. *See Heart of Atlanta Motel*, 379 U.S. at 275, 85 S.Ct. at 367; *McClung*, 379 U.S. at 302–03, 85 S.Ct. at 382–83.

## II. *Failure to Conciliate*

As an affirmative defense to this proceeding and any penalty, Morgan claimed that the Secretary failed to meaningfully conciliate. The Fair Housing Act requires that "the Secretary shall, to the extent feasible, engage in conciliation...." 42 U.S.C. § 3610(b)(1). Morgan claims error in the ALJ's evidentiary rulings. The ALJ held two in camera hearings and allowed Riciotti to testify concerning conciliation efforts, but apparently restricted Morgan to a proffer insofar as his testimony. I R. doc. E & F. The ALJ relied on 42 U.S.C. § 3610(d) and 24 C.F.R. § 103.330(a), which generally prohibit public disclosure of conciliation information and its use as substantive evidence concerning discrimination.

We find no reversible error concerning this evidentiary matter and we reject Morgan's argument that the present record does not allow evaluation of this claim. To the contrary, the parties do not contest the settlement events, only their characterization. The record establishes that the agency undertook to conciliate, the issue is whether it did so in good faith as required by the cases. *See EEOC v. Radiator Specialty Co.*, 610 F.2d 178, 183 (4th Cir.1979) (Title VII).[4]

■ Whether the Secretary conducted conciliation in good faith is not jurisdictional; rather, it goes to whether a court should stay proceedings pending further conciliation efforts or entertain the matter immediately. *See Marshall v. Sun Oil Co.*, 592 F.2d 563, 566 (10th Cir.) (ADEA), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); *EEOC v. Zia Co.*, 582

F.2d 527, 533 (10th Cir.1978) (Title VII); *Baumgardner v. HUD*, 960 F.2d 572, 578–79 (6th Cir.1992). The ALJ recognized that the "good faith" inquiry was not jurisdictional and declined to address the adequacy of conciliation, even insofar as monetary relief. I R. doc. M at 8.

In determining whether the Secretary has conducted conciliation in good faith, we recognize that the agency "should be given wide latitude in shaping both the general framework of conciliation and the specific offers made;" thus, we do not become embroiled in the details of offers and counteroffers. *EEOC v. Sears, Roebuck & Co.*, 650 F.2d 14, 18 (2d Cir.1981); *Zia Co.*, 582 F.2d at 533. We may look at the conciliation process employed by the agency, however, because if the requirement of conciliation is to have any meaning, the agency must provide a "fair opportunity" for settlement. *Sears, Roebuck & Co.*, 650 F.2d at 19. "While a respondent is certainly not entitled to a successful conciliation, he is entitled to an objectively reasonable effort by the agency to bring about a settlement of the charge." *Baumgardner*, 960 F.2d at 579.

■ The relevant testimony and the offer of proof, which is not disputed, indicates that the investigator consulted with the complainant and made one monetary settlement offer which was rejected by Morgan. In rejecting the offer, Morgan indicated that he would be interested in a settlement based on actual damages. The complainant was apprised of this overture and rejected it, but Morgan was never contacted again. Although the Secretary tells us that it is evident that his conciliation efforts were in good faith, it is not evident to us. To the contrary, the Secretary's effort ceased to be objectively reasonable when Morgan was not informed at least of the rejection of his overture.

Prior to the Secretary's monetary settlement offer, damages had not been itemized or quantified. Morgan's inquiry about a

---

4. Employment law concepts and rules frequently find application in fair housing cases. *See Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1451 (4th Cir.), *cert. denied*, 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990).

settlement based on actual damages was reasonable, and indicates a potential to narrow the dispute. The Secretary never got back to Morgan, let alone engaged in any further dialogue. This is inconsistent with an "objectively reasonable effort by the agency to bring about settlement of the charge." *Baumgardner,* 960 F.2d at 579. While it is true that Morgan did not seek a stay of the proceedings to attempt further conciliation, we would be hard pressed to characterize the Secretary's single "take-it-or-leave-it" offer and subsequent silence as meaningful conciliation. It may well be that Morgan would not have settled upon learning of the rejection of his "actual damages" overture, but we feel that the conciliation process should have afforded him the opportunity to make that choice prior to the Secretary's escalation of the conflict. This is not a case where negotiations reached an impasse or the respondent was unwilling to "engage in a meaningful colloquy." *See Marshall v. Sun Oil Co. (Delaware),* 605 F.2d 1331, 1337 (5th Cir.1979). We believe that the Secretary's conciliation effort, together with all the circumstances, may be considered in reviewing the penalty imposed. *See Baumgardner,* 960 F.2d at 579.

### III. *Sufficiency of the Evidence*

■ We review the ALJ's decision to determine whether it is "supported by substantial evidence on the record as a whole." *Arkansas v. Oklahoma,* — U.S. —, —, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992); *HUD v. Blackwell,* 908 F.2d 864, 870 (11th Cir.1990) (relying on 5 U.S.C. § 706(2)(E) & H.R.Rep. No. 100–711 at 38, *reprinted in* 1988 U.S.C.C.A.N. 2173, 2199). Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). We may not reweigh the evidence or "supplant ... findings merely by identifying alternative findings that could be supported by

substantial evidence." *Arkansas v. Oklahoma,* — U.S. at —, 112 S.Ct. at 1060.

With respect to the Riciottis' efforts to purchase the Sarno home, the ALJ determined that the Secretary had proven discrimination based on direct evidence. *See Pinchback v. Armistead Homes Corp.,* 907 F.2d 1447, 1452–53 (4th Cir.) (direct evidence case), *cert. denied,* 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990). The ALJ found that Morgan's enforcement of the "adults only" policy prevented the Sarnos from selling their home to the Riciottis. Morgan contends that the Riciottis' first offer of less than the Sarnos' asking price, followed by an offer from another couple willing to pay the full price, caused the transaction to fail. According to Morgan, as a matter of contract law, the Sarnos could not have sold their home to the Riciottis after receiving another offer for the asking price, and consequently, the ALJ's finding of discrimination is not supported by substantial evidence.

Morgan's argument is unavailing. First, the ALJ did not find that the Sarnos immediately accepted the other offer, but had two competing full-price offers and could have accepted either. I R. doc. M at 5. The ALJ found a complete lack of evidence that the Sarnos were precluded from selling their home to the Riciottis merely because an earlier offer had been made. Although Morgan invites us to speculate about the enforceability of the other full-price offer, Pet.Br. at 18 n. 15, no record evidence would cause us to chase that rabbit.

More importantly, "this is not a contract law case; it is a ... discrimination case." *Blackwell,* 908 F.2d at 872. The FHA prohibits refusals to negotiate for the rental of a dwelling space on the basis of familial status, as well as statements indicating such discrimination. *See* 42 U.S.C. § 3604(a) & (d). The record contains evidence of discrimination that the ALJ chose to credit. Sarno testified on deposition that he had "had a couple of conversations with Lee Morgan at his office, and I told him that I had a buyer for the home but that they had a child. And he was pretty

adamant about not selling to somebody with a child. He wouldn't let me do it." Resp.Add. at 12. Sarno further testified that Morgan told him "he would tie this thing up in the courts if he had to." *Id.* Riciotti testified that Morgan told him that " 'this is an all adult park and we do not allow children here.' " I R. doc. D at 35. This testimony was corroborated by Morgan. *Id.* at 165–66. The ALJ found that "[t]he Sarnos rejected the Riciottis because they didn't have the time to spend disputing the issue of children with Mr. Morgan." *Id.*, doc M at 5. This finding is supported by substantial evidence. *See* Resp.Add. at 14, 29. Although Morgan claims that Sarno was biased, we do not reweigh the evidence in our appellate review, even though the Sarnos testified by deposition. *Cf. Anderson v. City of Bessemer City,* 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

## IV. *Damages, Civil Penalty and Equitable Relief*

We review the ALJ's factual determination of damages for substantial evidence and any penalty for abuse of discretion. *See Burke v. Board of Governors,* 940 F.2d 1360, 1365–66 (10th Cir.1991) (relying upon 5 U.S.C. § 706(2)), *cert. denied,* —— U.S. ——, 112 S.Ct. 1957, 118 L.Ed.2d 559 (1992).

■ Morgan first argues that Riciotti should not recover damages because he did not have a contract to purchase the Sarno home. Of course, the existence of a contract is not a prerequisite to liability, civil penalties or damages under the Fair Housing Act. *See Blackwell,* 908 F.2d at 872; *Pinchback,* 907 F.2d at 1450–52 (adopting futile gesture theory).

Morgan next argues that the damages are excessive and any award should have been limited to out-of-pocket expenses and nominal damages. The ALJ determined the following actual damages:

| | |
|---|---|
| Economic Loss (alternate housing) | $ 7,362.49 |
| Inconvenience | 1,500.00 |
| Emotional Distress | 5,000.00 |
| Lost wages | 335.50 |
| Telephone/fax | 100.00 |
| | $14,297.99 |

### A. Alternate Housing

■ The ALJ awarded damages for alternate housing in the amount of $7,362.49. Although Riciotti was not "forced to obtain temporary or alternate housing," Pet.Br. at 37, we believe that the proper measure of damages is a comparison between what would have been obtained but for the discrimination (Sarno home) and a reasonably comparable dwelling. Such a concept is akin to "cover" under the UCC article 2 concerning sales transactions. *See Miller v. Apartments & Homes of New Jersey, Inc.,* 646 F.2d 101, 112 (3rd Cir.1981) (adopting "cover" rationale). In this case, the ALJ determined that the Krigbaum home was a reasonably comparable dwelling to the Sarno home. Both were offered for sale at about the same time and are located in the same mobile home park.

■ *Miller* involved $4,451.00 in damages due to increased rent and electricity costs associated with a substitute apartment. Morgan argues that *Miller* should not apply because of the increased value and equity which would have been received by the Riciottis had they purchased the Krigbaum home. The *Miller* court dismissed a similar contention, noting that even assuming greater value, a victim of discrimination may be compensated for what would otherwise be a "forced reallocation" of monetary resources to avoid discrimination. *Id.* Morgan's argument is really one of mitigation, but we will defer to the ALJ if his or her decision concerning a substitute home is reasonable and supported by substantial evidence. *Id.* Merely because the Krigbaum home was slightly larger and somewhat more expensive ($6,000) than the Sarno home does not render the ALJ's reliance upon it unreasonable. The Krigbaum mobile home was available, and in the park in which the Riciottis wanted to live. While there may be situations in which the disparity in value between the housing opportunity lost and the "cover" housing are so great as to render the comparison unreasonable (and a windfall to the complainant), this is not one of those situations.

## B. Inconvenience

■ Morgan also contends that the $1,500 awarded for inconvenience is not based on substantial evidence because the inconvenience allegedly experienced by Riciotti was not adequately specified. We agree. Although the ALJ listed several items considered in awarding inconvenience damages, such as (1) time spent in discussions with Mr. Morgan, their attorney, and HUD concerning the Sarno home, (2) not being able to live in the park between loss of the Sarno home and their decision not to purchase the Krigbaum home (approximately one month), and (3) applying for a loan on the Krigbaum home, these items do not support the award.

The ALJ double counted in awarding lost wages and inconvenience damages for consulting with the various parties and preparing for the hearing. Additionally, the ALJ's finding that the Riciottis were prevented from living in the mobile home park of their choice for one month, without more, does not constitute compensable inconvenience. The Riciottis were not forced to obtain substitute housing or move from their apartment during this time. Indeed, the Riciottis remained in their apartment until December 1989, when they moved into their townhome. Moreover, the efforts to obtain a loan on the Krigbaum home cannot be the basis for a $1,500 inconvenience award. Mr. Riciotti had already applied for a loan on the Sarno home, and merely called the banker to keep it open for the Krigbaum home; Riciotti did not go forward after that. See I.R. doc. D at 45. The record as a whole does not support the inconvenience award.

## C. Emotional Distress

■ Morgan next contends that the $5,000 amount for emotional distress is not supported by substantial evidence. We have recognized that emotional distress damages are available in Fair Housing Act cases for distress which exceeds the normal transient and trivial aggravation attendant to securing suitable housing, *Steele v. Title Realty Co.*, 478 F.2d 380, 384 (10th Cir.1973), but again as with the

inconvenience award, neither the fact of emotional distress, nor the dollar amount awarded, are supported by substantial evidence in this record. More than mere assertions of emotional distress are required.

■ We recognize that damages from emotional distress may be inferred from circumstances beyond the ordinary, in addition to being proven by testimony. *See Blackwell*, 908 F.2d at 872. Medical evidence concerning physical symptoms is not required. *Marable v. Walker*, 704 F.2d 1219, 1220 (11th Cir.1983). The fact that the damages for such distress are not capable of precise measurement does not bar recovery. *Id.* at 873. A causal connection must exist, however, between the illegal action and the complainant's injuries. *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir.1977).

■ As an initial matter, only about ten days elapsed between the loss of the Sarno home and Morgan's retracting the "adults only" rule upon being informed the rule violated the Fair Housing Act. After being informed that they could live there, the Riciottis immediately looked at other homes in the park, deciding to purchase the Krigbaum home in early July 1989. *See* I R. doc. D at 46, 65 (Riciotti thought the problem with Mr. Morgan had been cleared up by phone conversations in mid-June and did not foresee any problems). Riciotti was very interested in the Krigbaum home, it was "just perfect" and had "[m]ore room than the Sarnos', had a bigger lot, and nice amenities ... it was loaded." *Id.* at 42. The ALJ determined that Morgan did not prevent the Riciottis from living in the park after he retracted the rule in mid-June, rather the Riciottis chose not to purchase the available Krigbaum home. Thus, Mr. Riciotti's distress arising from events surrounding the Krigbaum home and the eventual occupancy of his townhome in December 1989 cannot be used to support the $5,000 award. *See* I R. doc. D at 37 (Riciotti testified that "it was like those two months [June and July 1989] were an emotional roller coaster for the whole family"). Our review of the record convinces us that it was these latter events upon which the

**1460**

distress damages are predicated. Moreover, the ALJ recognized that Mrs. Riciotti could not be compensated because she was not a named "aggrieved person," yet he compensated Mr. Riciotti for her stress, notwithstanding his findings that her stress headaches (which began in July) may have been attributable to her changing jobs. The record as a whole does not support the emotional distress award.

### D. Civil Penalty and Equitable Relief

██ We also have difficulty with the ALJ's entry of an injunction against Morgan and the award of the maximum civil penalty allowed, $10,000. The ALJ may grant equitable relief and, in order to vindicate the public interest, assess a civil penalty not to exceed $10,000 for a first-time violator. 42 U.S.C. § 3612(g)(3). Injunctive relief is appropriate to deter possible future violations and to "remov[e] any lingering effects of past discrimination." *Marable*, 704 F.2d at 1221. Concerning civil penalties, the House Report provides:

The Committee intends that these civil penalties are maximum, not minimum, penalties, and are not automatic in every case. When determining the amount of a penalty against a respondent, the ALJ should consider the nature and circumstances of the violation, the degree of culpability, any history of prior violations, the financial circumstances of that respondent and the goal of deterrence, and other matters as justice may require.

H.Rep. No. 100–711 at 37, *reprinted in* 1988 U.S.C.C.A.N. at 2198. The Secretary has been granted the authority to impose an appropriate and reasonable penalty; we may modify or set it aside only if it is unwarranted in law or unjustified in fact. *See* 42 U.S.C. § 3612(k); *Butz v. Glover Livestock Co.*, 411 U.S. 182, 185–188, 93 S.Ct. 1455, 1457–59, 36 L.Ed.2d 142 (1973).

### 1. *Civil Penalty*

██ The ALJ imposed the maximum penalty after characterizing Morgan's actions as "serious and egregious." I R. doc. M at 20. His actions were serious because they prevented sales of mobile homes until he was informed of the illegality of the

"adults only" rule. *Id.* Morgan's subsequent actions were egregious, according to the ALJ, because, after learning of the illegality, Morgan "took no immediate steps to comply with the law, except to inform the Riciottis that he would retract the policy." *Id.* (footnote omitted). The ALJ found that Morgan failed to publicize the change, other than informing the Riciottis, because his chief concern was with their complaint rather than canceling the policy. *Id.* The ALJ specifically found that Morgan must have known that the other tenants in the park would continue to comply with the policy. The ALJ reasoned that the maximum civil penalty would serve the goal of deterrence by teaching Morgan and others that "adult" communities are not permitted and that "once having learned of the law's requirements, [owners] must take all reasonable steps to eliminate the rules which discriminate against families with children." *Id.*

The ALJ essentially found that Morgan interfered with mobile home sales to families with children subsequent to learning of the invalidity of the "adults only" rule. The evidence will not support such a finding. Although the Secretary urges reliance on Ms. Krigbaum's deposition answer that she believed the park to be an adult park until she sold her home in August 1989, she also testified that (1) the Riciottis previously had informed her that, based on their lawyer's advice, they could purchase her home, notwithstanding her belief that it was an adult park, (2) the Riciottis repeatedly assured her that everything was fine vis-a-vis Morgan, and (3) she had no contact with Morgan during this time period. Resp.Add. at 43–46. Thus, Krigbaum was at least aware that the rule was not being applied to the Riciottis. In fact, she testified that she subsequently referred interested persons with children to Mr. Morgan. *Id.* Although Krigbaum indicated that she felt bound by her agreement to the park rules, she thought it more of an "ethical issue" stating: "I had lived in a quiet park for many years, and I owed it to the people after me, even though it would have been easy for me to sell to people

with children." *Id.* at 47–48. The record will not support a conclusion that tacit enforcement of the rule by Morgan interfered with the sale of the Krigbaum home after the Riciottis declined to purchase it. While we recognize that, had the facts been present, the ALJ could have found that Morgan's actions interfered with the sale of the Krigbaum home to the *Riciottis*, he found to the contrary and this has not been appealed.

Moreover, the finding that other tenants in the park would continue to comply with the rule in the absence of specific notice to the contrary from Morgan is pure speculation. Morgan argues that neither the ALJ nor the Secretary "point to anything that requires petitioner to do more than he did; he gave actual notice to the complainant and his wife and that . . . is sufficient." Pet.Br. at 26 n. 20. This would be a very different case if the Secretary had pled and proved that others were deterred by the rule, *see* 5 U.S.C. § 556(d) (proponent has burden of producing evidence); *Bosma v. USDA,* 754 F.2d 804, 810 (9th Cir.1984), but on this record, we agree with Morgan that his failure to give general notice of his determination not to enforce the rule cannot be a basis for the maximum civil penalty.

The ALJ found that Morgan "was unaware of the illegality of Rule 3 until this was pointed out to him by [Riciotti's attorney]," in a letter dated June 6, 1989. I R. doc. M at 20; doc. D at 145–46. The "familial status" amendments to the Fair Housing Act were enacted September 13, 1988 and became effective on March 12, 1989. *See* Pub.L. No. 100–430, § 13(a), 1988 U.S.C.C.A.N. (102 Stat.) 1619, 1636; *United States v. Southern Mgmt. Corp.,* 955 F.2d 914, 917–918 (4th Cir.1992); *Gorski v. Troy,* 929 F.2d 1183, 1184 (7th Cir. 1991). Although Morgan's ignorance of the law will not defeat liability, we think that it is a factor which must be considered in conjunction with the short time the familial status amendments had been in effect. Moreover, upon learning of the invalidity of the rule, Morgan sought the advice of legal counsel and no longer enforced it. He took the affirmative step of notifying the Riciottis. A few months later, the park rules were retyped to omit the invalid rule.

Because most of the factors relied upon by the ALJ in imposing the maximum penalty are not supported by substantial evidence, we hold that the ALJ abused his discretion in awarding the maximum penalty. We must reject the ALJ's characterization of Morgan's conduct as "egregious familial status" discrimination. Nor can we sustain the maximum civil penalty on a deterrence rationale; the public interest would not be well served by blanket imposition of penalties without regard to individual and personal conduct and competent proof, including mitigating factors. *See Rollins Envtl. Servs. (NJ) Inc. v. EPA,* 937 F.2d 649, 654 (D.C.Cir.1991).

While the events in question were unfortunate, and in view of the inadequate conciliation in this case, we believe that a civil penalty in excess of $500 would be so unjustified in fact as to constitute an abuse of discretion. *See Butz,* 411 U.S. at 188, 93 S.Ct. at 1459; *Baumgardner,* 960 F.2d at 583; *Ferguson v. USDA,* 911 F.2d 1273, 1283 (8th Cir.1990).

### 2. *Injunctive Relief*

We also will vacate the injunctive relief granted because the need for it is nowhere demonstrated on the record. *See Steele,* 478 F.2d at 385. To the contrary, Morgan complied with the law when informed of its existence, and sold the mobile home park in May 1990.

We AFFIRM the ALJ's finding of liability and compensatory damages pertaining to economic loss, lost wages and telephone/fax expenses. We REVERSE the $1,500 inconvenience and $5,000 emotional distress damages. We REVERSE the $10,000 civil penalty, and instead award $500. We VACATE the award of injunctive relief.