**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GOLDIE SAMS; ANDREW BROOKS,
Petitioners,

v.

No. 94-1695

U.S. DEPARTMENT OF HOUSING &
URBAN DEVELOPMENT,
Respondent.

On Petition for Review of an Order
of the Department of Housing and Urban Development.
(HUDALJ-03-92-0245-1)

Submitted: November 22, 1994

Decided: January 16, 1996

Before WILKINSON and WILKINS, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

C. Blaine Myers, BURK, MYERS, & ZIVKOVICH, Parkersburg,
West Virginia, for Petitioners. Deval L. Patrick, Assistant Attorney
General, David K. Flynn, Louise A. Lerner, Civil Rights Division,
UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Respondent.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This is a petition for review of the initial decision of an administrative law judge ("ALJ") which became the final decision of the Secretary of the Department of Housing and Urban Development. The ALJ found that Petitioners, Goldie Sams and Andrew Brooks, violated the Fair Housing Amendments Act of 1988, 42 U.S.C.A.§§ 3601-3619 (West 1977 & Supp. 1994) ("the Fair Housing Act" or "FHA"), by refusing to rent a house to the Paul family because the family included five children. Because of Petitioners' unlawful discrimination on the basis of "familial status," the ALJ awarded damages to the Paul family, enjoined future discrimination, and assessed civil penalties. Pursuant to the waiver of oral argument by the Petitioners, we have reviewed the record and the briefs and now affirm.

Goldie Sams owns rental property in a residential neighborhood in Vienna, West Virginia. Since 1990, Brooks, a mathematics teacher, has taken care of the house, ensuring that repairs are made, collecting rent, and forwarding the rent to Sams, who lived in Kentucky. If the house is vacant, Brooks advertises and shows the house to prospective renters. The advertisements to rent the house which attracted the Pauls did not restrict the number of children, no written rental application was required, and Sams did not require Brooks to ask any specific questions about prospective tenants. In determining whether to rent the property to prospective tenants, Sams asks Brooks about the renter's family composition, whether they are "nice people," and whether Brooks thinks they will take care of the property. She relies upon his opinion. Sams pays Brooks $25 per month for his services, and when Brooks rents the property Sams pays him one-half of the first month's rent. Brooks signs the leases on the line for "lessor," as agent for Sams.

2

In 1990, a husband and wife and their two children occupied the house. The next tenants were a couple who had one child and were expecting another. Theodore and Darlene Paul and their five minor children, relocating from New York, attempted to rent the property after these tenants left.[1] After an extensive search for housing, Theodore Paul became interested in Sams' house because it was close to shopping, church, and other activities, was secluded from busy traffic, had sidewalks and a fenced-in back yard, had a dining room which could be used for home schooling, and, at $375 per month, was affordable. He contacted Brooks, viewed the property, and prepared a videotape to send to his wife and five children in New York. Paul told Brooks that he would call him after consulting with his family. Brooks informed Paul that Sams would decide whether or not to rent to the Pauls; however, Paul did not anticipate any obstacle to their renting the house.

After viewing the videotape several times, the Pauls became enthusiastic about moving to West Virginia and about the house--which was larger than their home in New York. They began to make plans for the use of the rooms in the house. Mr. Paul telephoned Brooks to inform him that the family wished to rent the house and that he would bring the security deposit and rent that week.

When Brooks contacted Sams about the Paul family, he stated that he had a favorable impression of the family. However, after he informed Sams that the Pauls had five children, she refused to rent to them "because of the children." The following day, Brooks relayed to Mr. Paul that Sams would not rent to them because there were "too many children." Paul telephoned Sams to attempt to convince her to rent the house to them. During this conversation, Sams asked how many children he had, their ages, sexes, how they behaved, and whether Mrs. Paul worked. Sams stated her concern that the children would be unattended and would cause damage to the house.[2] After Paul assured Sams that the children were well-behaved, that Mrs. Paul

_____

[1] Prior to moving to West Virginia, the Pauls had lived in a three bedroom mobile home in New York. The family could not afford to pay more than $400 per month for rent.

[2] Sams stated that she did not like to rent to large families because her property had previously been damaged by a large family.

3

did not work, and that he would obtain insurance against damage to the house, Sams informed him that she and Brooks would discuss it and that she would leave the decision to Brooks. In reliance upon Sams' last statement, the Pauls expected that Brooks would rent the house to them. A day or two after Paul spoke with Sams, Brooks informed Mr. Paul that Sams decided not to rent the house to the Paul family because they had "too many children." Sams thereafter directed Brooks to use a lease limiting the rental of the property to no more than two adults and two children. She subsequently rented the house at $375 per month to a couple without children.

The Secretary of the United States Department of Housing and Urban Development issued a Determination of Reasonable Cause and Charge of Discrimination on behalf of Theodore and Darlene Paul and their five minor children, alleging that Petitioners violated 42 U.S.C.A. § 3604 (West Supp. 1994), and that Brooks violated 42 U.S.C.A. § 3605 (West Supp. 1994), by refusing to rent a dwelling to the Pauls because of familial status,[3] making discriminatory statements in connection with the rental of the dwelling, and engaging in an unlawful real estate related transaction because of familial status.

During an evidentiary hearing, the Pauls presented evidence concerning their chagrin at the loss of the house, the"tension [that] arose in the marriage . . . specifically beyond the tension of the Pauls being apart," and the children's confusion and disappointment. The Pauls secured less desirable housing at $25 more per month for rent and $39.85 more per month for water. In his Initial Decision, the administrative law judge ("ALJ") found that Petitioners violated § 3604(a) and § 3604(c), and that Brooks violated § 3605(a). The ALJ ordered that Petitioners compensate Mr. and Mrs. Paul for out-of-pocket expenses in the amount of $1621.25 and for loss of housing opportunity and emotional distress in the amount of $7,500. Petitioners were ordered to pay $2,000 to each of the four older children for loss of housing opportunity and emotional dis tress and $1,000 to the youngest child for loss of housing opportunity. In addition to injunctive relief which is not challenged on appeal, the ALJ assessed civil penal-

_____

[3] "Familial status" is defined as "one or more individuals (who have not attained the age of 18 years)" living with a parent, legal guardian, or designee. 42 U.S.C.A. § 3602(k) (West Supp. 1994).

4

ties of $5,000 against Sams and $250 against Brooks. Upon the expiration of thirty days without review by the Secretary, the ALJ's decision became the final agency decision. 42 U.S.C.A. § 3612(h)(1) (West Supp. 1994).

Petitioners filed this petition for review challenging the ALJ's findings that Petitioners engaged in discriminatory housing practices in violation of § 3604 and that Brooks violated § 3605 of the FHA. They also challenge the amount of damages, the exclusion of evidence of previous rental to families with children, and the assessment and amounts of the civil penalties imposed.

Petitioners contend that they refused to rent the house to the Paul family based upon a determination that seven persons in the house exceeds the number that is reasonable, rather than discrimination based on familial status. They assert that there is no evidence that Sams would have rented the dwelling to seven adults. However, the ALJ considered this argument and found as a fact that the denial of housing was due to Sams' bias against families with a large number of children.[4]

This finding is supported by substantial evidence on the record. See Baumgardner v. Secretary, U.S. Dep't of Hous. & Urban Dev., 960 F.2d 572, 579 (6th Cir. 1992); Secretary, U.S. Dep't of Hous. & Urban Dev. ex rel. Herron v. Blackwell, 908 F.2d 864, 870 & n.2 (11th Cir. 1990). When Brooks showed the house to Mr. Paul, he did not inform Paul that there was an occupancy limit. After Brooks contacted Sams concerning the Pauls' interest in the house, Brooks informed Paul that he could not rent the house due to the number of children. When Paul contacted Sams to convince her to rent the house to his family, Sams inquired about the number of children, their behavior, and the amount of supervision. Sams also told Paul that she believed that large families are destructive. Sams continued to deny

_____

[4] Petitioners also argue that the ALJ improperly excluded evidence that Sams had previously rented to families with a large number of children. We note that the ALJ found that Sams had rented to large families, but concluded that such evidence does not show that Sams had not discriminated on the basis of familial status on this occasion. See Davis v. Mansards, 597 F. Supp. 334, 345 (N.D. Ind. 1984).

5

this rental opportunity to the Pauls after Mr. Paul stated that the children are well-mannered and offered to insure the property against the perceived danger of destruction by the children. After ultimately refusing to rent the house to the Paul family, Sams directed that Brooks change the lease to limit occupancy to two adults and two children. These facts represent substantial evidence that Petitioners' refusal to rent to the Pauls was based not upon the desire to establish a reasonable occupancy limit, but rather upon discrimination based on familial status. See Blackwell, 908 F.2d at 870-71.

Petitioners also contend that the ALJ erroneously found that Brooks' "business includes engaging in residential real estate-related transactions."[5] They contend that rather than being in the real estate business, Brooks, a school teacher, was merely assisting a friend.

The ALJ's finding that Brooks' business includes engaging in residential real estate-related transactions is also supported by substantial evidence of record. See Blackwell, 908 F.2d at 870 & n.2. Sams paid Brooks $25 per month for his service, which included advertising and showing the property to prospective tenants, arranging for necessary repairs and maintenance, providing information and his opinion to Sams regarding potential tenants, signing a lease as "agent for" Sams, and collecting rent checks and forwarding the checks to Sams. Sams paid Brooks one-half of the first month's rent whenever he rented the property to new tenants. Because substantial evidence supports the ALJ's finding that Brooks acted as agent or broker for Sams, we uphold this determination. In his capacity as agent or broker, Brooks complied with Sams' direction to deny housing to the Paul family because of familial status. He is therefore liable under 42 U.S.C.A. § 3605. See Jeanty v. McKey & Poague, Inc. , 496 F.2d 1119, 1120-21 (7th Cir. 1974).

_____

[5] "Residential real estate-related transactions" is defined to include "[t]he selling, brokering, or appraising of residential real property." 42 U.S.C.A. § 3605(b)(2) (West Supp. 1994). A "broker" includes "any person authorized to perform an action on behalf of another person regarding any matter related to the sale or rental of dwellings." 24 C.F.R. § 100.20 (1993).

6

Petitioners argue that the amount of damages awarded to the Paul family for emotional distress and loss of housing opportunity exceeded the amount that is supported by the record. Petitioners note that "Mr. Paul did not miss a single day of work," and there was no evidence that any family member required medical or psychological treatment. However, such evidence is not a prerequisite to recovery for emotional distress. Morgan v. Secretary of Hous. & Urban Dev., 985 F.2d 1451, 1459 (10th Cir. 1993); Marable v. Walker, 704 F.2d 1219, 1220 (11th Cir. 1983). Damages are available under the Fair Housing Act for "distress which exceeds the normal transient and trivial aggravation attendant to securing suitable housing." Morgan, 985 F.2d at 1459.

In considering the effects of the Petitioners' denial of housing on the Paul family, the ALJ compared Sams' house to the apartment the Pauls were forced to rent. The ALJ noted that the house provided more space, more safety, was more amenable to home schooling of the children, was closer to church and other activities, and provided a more stable neighborhood. The ALJ's conclusion that the Pauls must be compensated for the loss of housing in an ideal environment is clearly supported by the record.

Additionally, the ALJ determined that the record as a whole demonstrated the need for the award of damages to the Pauls for emotional distress. See Morgan, 985 F.2d at 1459. The ALJ noted the Paul family's reactions to the denial of this rental opportunity at an especially vulnerable time and found that Sams' refusal to rent to the Pauls after expressing the possibility of changing her mind was "plainly meanspirited" and created additional emotional distress. We find that these factual findings are well supported by the record and that the awards of compensation for emotional distress are not excessive. See Jay Edwards, Inc. v. New England Toyota Distrib., Inc., 708 F.2d 814, 819 (1st Cir.), cert. denied, 464 U.S. 894 (1983); Locklin v. Day-Glo Color Corp., 429 F.2d 873, 880 (7th Cir. 1970), cert. denied, 400 U.S. 1020 (1971).

This case has been submitted on briefs on Petitioners' motion. We affirm the decision of the ALJ.

AFFIRMED

7